UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DINA M. ROBLES BUSH | CIVIL ACTION |
| VERSUS | NO. 11-1654 |
| THORATEC CORPORATION, ET AL. | SECTION "L" (3) |

**ORDER & REASONS**

Before the Court are motions to amend the judgment by Defendant United States (Rec. Doc. 204) and Plaintiff Diana Robles Bush (Rec. Doc. 205). Having considered the parties' memoranda and applicable law, and having heard oral argument, the Court now issues this order.

**I.     BACKGROUND**

Mrs. Bush brought this action on behalf of her deceased husband, Pete Bush ("Mr. Bush"). Mr. Bush was a recipient of the Thoratec HeartMate II left ventricular assist system ("LVAS"), a surgically implanted heart pump manufactured by now-dismissed Defendant Thoratec Corporation ("Thoratec"). It was implanted by the Hunter Holmes McGuire VA Medical Center ("McGuire"), a facility operated by Defendant United States, and Mr. Bush received follow-up care at both McGuire and at Tulane University Medical Center and Clinic ("Tulane"), a facility operated by Defendant University Healthcare System, L.L.C., which has also been dismissed.

Mrs. Bush originally filed suit in Civil District Court for the Parish of Orleans against Thoratec and Tulane. On July 14, 2011, Thoratec removed to this Court, and on October 24, 2011, the Court denied Mrs. Bush's motion to remand and granted Tulane's motion to dismiss on the basis that Mrs. Bush had not proceeded through a medical review panel with respect to her claims against Tulane. (Rec. Doc. 40).

On November 29, 2011, the Court granted Thoratec's motion to dismiss Mrs. Bush's claims. (Rec. Doc. 41). Mrs. Bush filed an amended complaint (Rec. Doc. 44) and then sought and received leave to file a second amended complaint (Rec. Doc. 68) against Thoratec.

On July 27, 2012, Mrs. Bush requested leave to further amend her complaint, this time adding claims against the United States. (Rec. Doc. 90). The Court granted Mrs. Bush's request (Rec. Doc. 91), and her third amended complaint was entered into the record. (Rec. Doc. 92). The third amended complaint was dismissed without prejudice shortly thereafter and immediately re-entered, following the presumed final denial of Mrs. Bush's administrative appeal in Virginia. (Rec. Docs. 98, 99, 100). All claims against Thoratec were then settled and dismissed on June 28, 2013. Currently, the only remaining claims were those against McGuire under the Federal Tort Claims Act ("FTCA"). Specifically, Mrs. Bush alleged:

> Dr. Gundars Katlaps, Lisa Martin and other employees of McGuire failed to properly monitor [the] LVAS, failed to properly instruct the Bushes on how to monitor the percutaneous lead of [the] LVAS for damage, failed to provide proper notice to the Bushes regarding the defects of the . . . LVAS, failed to render proper medical care to him at the time of his medical emergency on May 4, 2010, and committed other acts of negligence and medical malpractice . . . .

(Rec. Doc. 100 at 14).

On November 5 and 6, 2013, the case was tried without a jury. Following the trial, this Court issued findings of fact and conclusions of law, holding that Dr. Katlaps and Ms. Martin had breached the applicable standard of care and that the breach had been the proximate cause of Mr. Bush's death. (Rec. Doc. 202). It then ordered that "the United States pay Mrs. Bush $200,000.00 for sorrow, mental anguish, and solace and pay $23,535.00 in compensation for reasonably expected loss of income of the decedent and services, protection, care and assistance provided by the decedent, with a credit for the amount of consideration paid for the prior

settlement."[1] (Rec. Doc. 202 at 37). A judgment was entered in Mrs. Bush's favor, ordering payment of the above-listed amounts "in addition to court costs and judicial interest from the date of judgment until paid." (Rec. Doc. 203 at 1).

## II.   PRESENT MOTIONS

### A.   United States' Motion to Amend

The United States now moves to amend the judgment pursuant to Federal Rule of Civil Procedure 59(e). (Rec. Doc. 204). Specifically, it seeks to amend the calculation of judicial interest. *First*, it argues that judicial interest must accrue, not from the date of the judgment, but from the date the judgment becomes final *after* review or appeal and *after* it has been filed with the Treasury Department, pursuant to 31 U.S.C. § 1304. (Rec. Doc. 204-1 at 2). *Second*, the United States argues that the language of the judgment should be amended to clearly indicate that it is only required to pay judicial interest on the amount it owes, not the amount the entire amount of damages before subtracting the prior settlement amount. Mrs. Bush responds that the judgment should not be amended because the procedure for filing the judgment with the Treasury Department is undefined. (Rec. Doc. 209). Specifically, Mrs. Bush notes that the Treasury Department has been unable to provide any guidance on how to comply with the filing requirement contained within 31 U.S.C.§ 1304. The United States replies that 31 C.F.R. § 256.32 provides specific instructions. (Rec. Doc. 222).

### B.   Mrs. Bush's Motion to Amend

Mrs. Bush also moves for a new trial under Rule 59(a) or, in the alternative, to amend the judgment pursuant to Rule 59(e). (Rec. Doc. 205). *First*, she argues that "[i]n every case where

---

[1] The findings of fact and conclusions of law also state that "the Court finds that Mrs. Bush has not sustained any injury due to the negligence of the United States or its employees, Dr. Katlaps and Ms. Martin." (Rec. Doc. 202 at 37). The negligence of Dr. Katlaps and Ms. Martin resulted in injury to *Mr.* Bush, for which the United States was liable to *Mrs*. Bush. This is stated clearly in both the findings of fact and conclusions of law, as well as the subsequent judgment.

the Court highlighted the age of the decedent, the survivor was awarded general damages greater, and in some circumstances far greater," than the general damages she received. (Rec. Doc. 205-1 at 1). She thus believes the damages should be increased. *Second*, Mrs. Bush argues that he Court erred in concluding that Mr. Bush's life expectancy was two years at the time of his death. In particular, she reasons that, because Dr. Katlaps testified his life expectancy was five years at the time of implantation, that means his life expectancy was three years and five months at the time of his death (that is, five years *minus* the one year and seven months since it was implanted). As a result, Mrs. Bush seeks an increase in the amount of loss of income based on life expectancy of five years, equating to an additional $66,139.55. (*Id*. at 4). *Third*, Mrs. Bush argues that the Court should have—but did not—award any damages for loss of society, companionship, comfort, guidance, kindly offices, and advice. Alternatively, if the Court does not award such damages, she argues that the United States should not be given credit for the prior settlement's award of such damages. *Fourth*, Mrs. Bush argues that the Court should have—but did not— award damages for reasonable funeral expenses because the United States had not previously stipulated to pay such damages.

The United States responds. (Rec. Doc. 211). *First*, it argues that the damage award was not only reasonable, but supported by the cited precedent, in which larger awards were distributed among multiple survivors or in which the decedent's life expectancy was far greater than Mr. Bush's. *Second*, the United States argues that Dr. Katlaps' testimony regarding Mr. Bush's life expectancy was taken out of context. Specifically, Dr. Katlaps stated that Mr. Bush could have survived five years at most with the device *from the time it was implanted*. Thus, the United States contends that the amount of loss of income was reasonable. *Third*, it argues that damages for loss of society, companionship, comfort, guidance, kindly offices, and advice are a

4

subset of damages for sorrow, mental anguish, and solace, for which the Court already awarded damages. Therefore, it suggests that it is not appropriate to award additional damages or to reduce the credit for the prior settlement to account for non-duplicative damages. *Fourth*, the United States agrees that the parties did not enter any stipulation regarding whether funeral expenses had been paid, only as to the amount of those expenses. The United States, however, suggests that Mrs. Bush should be precluded from seeking such an award, however, because she failed to mitigate her losses by applying for repayment from the VA. Mrs. Bush then replies, reasserting her previous arguments. (Rec. Doc. 217).

### III.  LAW & ANALYSIS

#### A.  Law

Rule 52(b) provides that, "[o]n a party's motion . . . the court may amend its findings—or make additional findings—and may amend the judgment accordingly." FED. R. CIV. P. 52(b). Such a motion is made pursuant to Rule 59. FED. R. CIV. P. 59(a)(2), -(e). It may be used "to correct manifest errors of law or fact" but not "to relitigate old issues, to advance new theories, or to secure a rehearing on the merits." *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1219 (5th Cir. 1986). Any new or amended findings of fact or conclusions of law must generally be based on evidence and testimony already in the record. *Id*.

#### B.  Analysis

The present motions request that the findings of fact and conclusions of law, as well as the judgment, be amended for several reasons. Each will be addressed in turn. First, the United States requests that the judgment be entered to correct the method for calculating judicial interest. As it is exists now, the judgment provides that the United States pay "judicial interest from the date of judgment." (Rec. Doc. 203 at 1). This is incorrect. The United States Court of Appeals for the Fifth Circuit has determined that "interest cannot be awarded against the

5

government in an FTCA suit absent express statutory authority" and that authority is provided by 31 U.S.C.§ 1304. *Lucas v. United States*, 807 F.2d 414, 423 (5th Cir. 1986). Accordingly, the judgment must be amended to reflect that the United States pay judicial interest from the date the judgment becomes final after review on appeal or petition by the United States, and then only from the date of filing of the transcript of the judgment with the Secretary of the Treasury through the day before the date of the mandate of affirmance. 31 U.S.C. § 1304(b)(1)(A). Additionally, the United States has suggested that the judgment be clarified to state that judicial interest must *only* be paid on the amount actually owed by the United States (that is, the total amount of damages with credit for the amount of the prior settlement). The amount actually owed was omitted from the judgment because the prior settlement is sealed. However, in the interest of clarity, the amount actually owed by the United States will be stated in the amended judgment and that judgment will be filed under seal. Judicial interest is due only on the amount actually owed by the United States.

Second, Mrs. Bush suggests that the amount of general damages was inadequate in comparison to awards made in similar cases. In its findings of fact and conclusions of law, the Court stated:

> Prior to reaching a determination as to damages, it is relevant to consider the awards made in other instances where medical malpractice has resulted in death. Of course, prior awards are not dispositive since each case is dependent on its own unique facts, but prior awards for similar damages are instructive. A survey of these awards demonstrates that general damages—that is, those for sorrow, mental anguish, and solace—are usually between $150,000.00 and $950,000.00 for each survivor and specific damages vary. *See, e.g.*, *Estate of Robertson v. Perry*, 2013 WL 7139777 (Va. Cir. Ct. 2013) (awarding $50.466.80 in medical expenses, $10,316.85 in funeral expenses, and $216,822.27 to each survivor of an 89-year-old patient); *Estate of Willever v. Williams*, 2012 WL 4503122 (Va. Cir. Ct. 2012) (awarding $438,000.00 in medical expenses and $390,500.00 to

6

> each survivor of a 73-year-old patient); *Estate of Madison v. Chesapeake Anesthesiologists*, 2011 WL 7163456 (Va. Cir. Ct. 2011) (awarding $425,000.00 to the spouse and $125,000.00 to each child of a patient); *Estate of Lopez v. Galumbeck*, 2010 WL 5517655 (Va. Cir. Ct. 2010) (awarding $975,000.00 to the spouse and $243,750.00 to each child of a 36-year-old patient); *Estate of Budnick v. Barry v. Walter*, 2009 WL 5171892 (Va. Cir. Ct. 2009) (awarding $46,997.56 for medical expenses, $2,675.00 for funeral expenses, and $2,200,000.00 to the survivor of a patient); *Estate of Browder v. Gamache*, 2009 WL 1912388 (Vir. Cir. Ct. 2009) (awarding $211,953.29 for medical expenses, $785,000.00 for economic loss, and $6,500,000.00 to the survivor of a patient); *Cumbee v. Nicholson*, 2007 WL 4755239 (Va. Cir. Ct. 2007) (awarding $56,163.29 in medical expenses, $10,512.38 in funeral expenses, and $140,000.00 to each of survivor of a patient); *Estate of Butler v. Mid-Atlantic Permanente Med. Grp., P.C.*, 2003 WL 22111034 (Va. Cir. Ct. 2003) (awarding $950,000.00, approximately $161,615.00 to $368,614.00 of which was for loss of income, to the survivor of a 53-year-old patient with a life expectancy of 15 to 20 years); *Estate of Fadle v. Mueller*, 1998 WL 1757227 (Va. Cir. Ct. 1998) (awarding $724,000.00 to the survivor of a 63-year-old patient). Additionally, there does not appear to have been any award for punitive damages in such a case in the past decade.

(Rec. Doc. 202 at 34-35).

In awarding damages, a "trial court has great latitude." *Parks v. Dowell Div. of Dow Chem. Corp.*, 712 F.2d 154, 160 (5th Cir. 1983). Here, an award was fashioned after carefully considering both the evidence and testimony, and after a thorough and comprehensive review of other awards in Virginia. It is incontrovertible that the loss of a spouse is catastrophic event for which a surviving spouse will never be made completely whole, regardless of the amount of damages. Nonetheless, this Court attempted to reach a fair and just amount by painstakingly considering the facts and the law. The fact that Mr. Bush had such a limited life expectancy and lived such a restricted and precarious life must be considered. The Court sees no reason to disturb its award now on the basis that it is disproportionate to the awards in other, factually and legally distinguishable situations.

Mrs. Bush also argues that the amount for loss of income was inappropriate because it relied on an incorrect determination that Mr. Bush's life expectancy was two years, not five years. In making a determination that Mr. Bush was expected to live two years, the Court relied on the entirety of Dr. Katlaps' testimony, as well as the evidence and other testimony presented at trial. Dr. Katlaps' testimony regarding life expectancy follows. Initially, he states that, from the date of implantation, an average patient's life expectancy would be about five years with the LVAD.

> A:  . . . . So in a lab situation, the device was—they felt the device might last for five to seven years. Now, but that is in a lab setting when there is no, again, device—no device[-]patient interaction in anyway. When, when the device is implanted in an actual patient, then the lab settings don't frequently work out.
>
>  . . . . So then we have to take into account the experience of the centers who have already placed this device before. And based on that, based on their experience, I could—I was—you know, would have suggested that the chance that the device will work for a year, two, three years after implantation would be, you know, around may 80, 60, and 50 percent, something like that respectively.
>
>  . . . .
>
> I think it would be safe to say that approximately 50 percent of the patients that are receiving this [LVAD], those days were still alive three years after implantation of it.

(Katlaps Tr. at 36-37). He then states that, at the time of implantation, Mr. Bush's life expectancy would have been only days or weeks without the LVAD.

> A:  So, you know, as I describe, I believe that Mr. Bush would have died within weeks or, or even days had he not received implant of the [LVAD]. So with that, my estimate that he could have been alive a year later without [it] would have been zero, which means I estimate that he would have had a hundred percent chance to be dead, not only at one year. I estimate that he would have a hundred percent

8

> chance to be dead at six months and at one year and at two years.

(*Id*. at 52-53). Dr. Katlaps further states that, at the time of his death, Mr. Bush's life would have increased to "[m]aybe, maybe, maybe one, two, or three years" with the LVAD.

> A: . . . . As you understand, there is no way to know . . . . But there are some criteria that can help us make that estimate more accurate, like patient's age, you know. Pete Bush was already in his early sixties and comorbidities. Pete Bush had had two entries into his chest. You know, his surgery was more invasive than, than some others. Mr. Bush had, they called it a history of terminal vascular disease, chronic obstruction pulmonary disease, COPD. He had recorded a history of a set of vascular accidents.
>
> Taking all that into account, his life expectancy was limited for many reasons, which were not—which had nothing to do with the LVAD.[2] And then, you know, we have some help trying to incorporate some of his—the life expectancy as it related to the LVAD. And we knew based on the experience of, of ours and other centers at that time, again that, you know, we had those, those again, the statistical analysis, you know, one year, two year, three year survival on these devices.
>
> Q: And so what is your, what is your opinion as to Mr. Bush's life expectancy at that time?
>
> A: Maybe, maybe, maybe one, two, or three years.

(*Id*. at 67-68). He later states that, at the time of implantation, his life expectancy would not have exceeded five years with the LVAD.

> Q: . . . [W]ould you agree that his life expectancy using the [LVAD] would be no less than five years?
>
>      . . . .
>
> A: Definitely less than five years.
>
>      . . . .

---

[2] Mrs. Bush notes Dr. Katlaps' testimony that, "if [Mr. Bush] had continued living on the LVAD, then most likely he would have lived to a point when a good heart offer would have become available." (Katlaps Tr. at 70). However, Dr. Katlaps' testimony also makes it clear that Mr. Bush could have died from other causes even had the LVAD continued to function. Stated differently, whether he "continued living on the LVAD" depended on his own good health as well as the good health of the device.

9

>   Q:   No less than five years.
>
>   A:   Oh, it would definitely be less than five years.
>
>   . . . .
>
>   Given his life expectancy, would that have been significantly less than five years? Yeah.
>
>   . . . .
>
>   . . . . [B]ased on the knowledge what I have now and the knowledge I had then, I would have to say that I would not expect his life expectancy past five years. Most patients like Pete Bush would not live for more than five years, you know, with an LVAD.
>
>   . . . .
>
>   . . . . [N]either then nor now I would expect that he'll live for more than five years on that device.

(*Id.* 133-36).

This testimony, in its entirety, formed the basis for the conclusion that Mr. Bush's life expectancy at the date of his death was two years. Dr. Katlaps indicates that Mr. Bush might have lived up to five years *at the time the device was implanted*, but was expected to live one to three years *at the time of his death*. Accordingly, it is not necessary or appropriate to disturb this finding and conclusion merely because there is some disagreement. Mr. Bush's life expectancy was determined on the basis of the evidence and testimony determined to be most credible and applicable.

Mrs. Bush next suggests that she should have been awarded damages for society, companionship, comfort, guidance, kindly offices and advice *in addition to* damages for sorrow, mental anguish, and solace. Under Virginia law, there are several categories of damages that are available in a wrongful death action. One of those categories allows an award of damages for "[s]orrow, mental anguish, and solace *which may include* society, companionship, comfort, guidance, kindly offices and advice of the decedent." VA. CODE ANN. § 8.01-52 (emphasis

added). This construction clearly indicates that society, companionship, comfort, guidance, kindly offices and advice are subcategories of sorrow, mental anguish, and solace because the language indicates that former are included within the latter. Although the subcategories may be considered in awarding damages for sorrow, mental anguish, and solace, they do not constitute a separate category in addition to sorrow, mental anguish, and solace. Here, Mrs. Bush has already been award damages for sorrow, mental anguish, and solace. Prior to setting that award, the Court provided each of the categories of relief, including the subcategories at issue here. It considered these in fashioning its determination of damages for sorrow, mental anguish, and solace. Thus, is not necessary or appropriate to increase this award or reduce the credit for the prior settlement.

Last, the parties are in agreement that they did not stipulate as to the payment of funeral expenses, only as to the amount of those expenses. The United States has suggested that Mrs. Bush should have attempted to mitigate this loss by requesting reimbursement from the VA. However, at oral argument, the United States acknowledged that it is responsible for these expenses, whether they are paid through the VA reimbursement process or through litigation. To ensure that Mrs. Bush is reimbursed, the judgment must be amended to require the United States to pay the stipulated amount of $1,897.00 for funeral expenses.

### IV. CONCLUSION

For these reasons, **IT IS ORDERED** that an amended judgment be entered and that the amended judgment (1) require the United States to pay $1,897.00 for funeral expenses, (2) require the calculation of judicial interest in accordance with 31 U.S.C. § 1304, and (3) expressly state the actual amount of damages to be paid by the United States (that is, the entire amount of damages with credit for the amount of the prior settlement).

**IT IS FURTHER ORDERED** that the amended judgment be **SEALED**.

New Orleans, Louisiana, this 30th day of May, 2014.

_____
UNITED STATES DISTRICT JUDGE